IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**KEITH SUGGS**
9422 Woodsong Court
Laurel, Maryland 20723

      Plaintiff

v.

**7-ELEVEN, INC.**
1722 Routh Street, Suite 1000
Dallas, Texas 75201

      Defendant.

**Civ. No 8:14-cv-01903-DKC**

**SECOND AMENDED COMPLAINT**

**Jury Trial Demanded**

---

1.     Plaintiff Keith Suggs ("Plaintiff"), by and through counsel, brings this Second Amended Complaint against 7-Eleven, Inc. ("7-Eleven" or "Defendant") for violations of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and Md. Code Ann. State Gov't § 20-606 *et seq.,* based upon Defendant's actions in failing to promote him based upon his race, and retaliating against him for complaining of racial discrimination, including filing multiple charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), and pursuing these charges vigorously through the EEOC administrative process and in this Court while continuing his employment at Defendant.  Plaintiff seeks, *inter alia*, a declaratory judgment; compensatory damages; back pay and front pay; and attorney's fees.

<strong>PARTIES</strong>

2.     Plaintiff is a citizen of the State of Maryland.  He is African American.  He has been employed as a Field Consultant by Defendant since August 31, 2009.  As a Field Consultant, he was responsible for overseeing a subgroup of nine 7-Eleven stores, including overseeing earnings growth, cleanliness, and general quality control at those stores.  At all relevant times, Plaintiff's stores were located in Montgomery County, MD, in Defendant's Market 2541.

1

3.      Defendant is a citizen of the State of Texas, being a corporation organized and existing under the laws of Texas, doing business at all relevant times in the State of Maryland. Defendant employs more than 15 people.  Its principal place of business is Dallas, Texas.

4.      Defendant's Zone Office for Market 2541 is located at 8904 Edmonston Road, College Park, Maryland 20740, in Prince George's County, Maryland.

5.      At all times, the employees of Defendant mentioned herein were acting within the scope of their employment, and Defendant is responsible for the actions and conduct of those employees.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

6.      Venue is proper in this district under 28 U.S.C. §1391 because substantial part of the events and omissions giving rise to this claim occurred in the District of Maryland, Southern Division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      Plaintiff has exhausted his administrative remedies on his Title VII claims by filing two timely charges with the EEOC on which he has received Right to Sue letters, and by filing this lawsuit in a timely manner pursuant to a tolling agreement entered into with Defendant concerning those charges. Plaintiff's claims are also timely because he may raise claims that he was retaliated against for filing an EEOC charge for the first time in federal court. *Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 418 (4th Cir. 2014); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297 (4th Cir. 2009); *Nealon v. Stone*, 958 F.2d 584 (4th Cir. 1992).

## FACTUAL BACKGROUND

8.      Plaintiff was hired by as a Field Consultant by Defendant on or about August 31, 2009.

9.      At 7-Eleven, Field Consultants report to and are evaluated by Market Managers.

10.     Field Consultants receive an evaluation based on a combination of objective and subjective factors.  Field Consultants receive an initial evaluation at mid-year, and then receive a final evaluation at year-end.

11.     Field Consultants are initially awarded a "red," "yellow," or "green" score on a non-discretionary basis in several categories designed to measure objective factors such as the

2

profitability, cleanliness, and organization of the stores that the supervise, with "green"
indicating that their stores are above-standard in a particular category, "yellow" indicating that
their stores are at standard, and "red" indicating that their stores are below standard. The number
of "green," "yellow," and "red" ratings are then tallied, and the Field Consultant is awarded a
grade of "A," "B," and "C," with "A" the highest and "C" the lowest grade possible. These
grades are not awarded on a discretionary basis by the Market Manager but are based
comparison of either aggregate store revenue or percentages of stores meeting certain measurable
benchmarks.

12.     Field Consultants also receive a grade of "+," "/" or "-" from their Market
Managers on soft factors such as "Integrity," "Guest Focus," and "Accountability."

13.     7-Eleven has claimed that it only considers Field Consultants for promotion to
Market Manager if the Field Consultant has earned an A+, B+, or A/ on his or her most recent
full-year performance appraisal. However, 7-Eleven did not follow this policy in Plaintiff's case.

14.     On his first full-year evaluation, covering the 2010 calendar year, Plaintiff
received a positive evaluation from his then-supervisor, Scott Teachenor, a white male. Plaintiff
received a grade of "B/," with Teachenor concluding, "Keith has done a fine job establishing
himself as a valued member of the Market team and dealing with a large amount of change in
leadership and group dynamics in 2010."

15.     In October 2011, Teachenor left his position as Market Manager, and was
replaced by Mike Crist, also a white male.

16.     Plaintiff observed that Crist treated white Field Consultants more favorably than
African American Field Consultants.

17.     For example, in November 2011, Plaintiff was the Subject Matter Expert on the
2012 budget for stores in Market 2541. On the evening of November 10, 2011 Plaintiff emailed
Steve Fuhrman, a white Field Consultant, his copy of the 2012 budget for his stores, along with
Plaintiff's comments on it. Fuhrman emailed back the next morning asking whether Suggs had
sent him the budget. Suggs responded, "Check your email it was sent last night by me!"
Fuhrman took offense, responding back, "I am not sure why you can't answer the question when
you put the effort of sending the email." Crist called Suggs shortly after, complaining that
Plaintiff had been rude to Fuhrman. When Plaintiff asked whether he had spoken to Fuhrman

about this incident, Crist replied, "No." To Plaintiff's knowledge, Fuhrman was never reprimanded for this incident.

18.     Plaintiff was aware that Fuhrman had a reputation in the market of being able to say or do whatever he wanted, without any discipline or other repercussions. Fuhrman was routinely 30-45 minutes late to meetings and other group functions, and often would not attend at all.

19.     Plaintiff also complained to Crist at an October 2011 meeting that Field Consultants were not being promoted from within his market (Market 2541), despite the market's superior record of performance in food sales and other categories. Plaintiff also complained that African American field representatives had difficulty achieving promotions at Defendant.

20.     On November 13, 2011, Plaintiff filed a complaint via email with Defendant's Human Resources Department complaining about disparate treatment between African American and white Field Consultants in Plaintiff's market, following up on an earlier oral complaint made to Human Resources on November 11. In the email, he also stated that, "My biggest fear is that I will be retaliated & targeted again for bring[ing] this matter to Human Resources." Plaintiff did not receive a satisfactory response to his complaint.

21.     On or around late 2011, Dahir Amalo, an African American who had been serving as a Customer Experience Consultant (CEC), and had previously been a Field Consultant in Market 2541, sought to return to his position as a Field Consultant in Market 2541. It was typical for CECs to return to Field Consultant positions after serving a stint as a CEC. Brennan informed Amalo that there were no Field Consultant positions open in Market 2541. Two weeks later, Defendant hired Alex Boland, a white male, as a Field Consultant in Market 2541.

22.     On February 9, 2012, Plaintiff wrote a letter to Tom Brennan, a white male who was Plaintiff's superior, holding the title of Zone Manager, complaining of disparate treatment by Crist towards Plaintiff and other African American Field Consultants. In this letter, Plaintiff stated that he was "very fearful that [he] will be retaliated [against] in a manner that will result in the loss of my job or movement to another market."

23.     Subsequently, in February 2012, Plaintiff received his year-end Performance Appraisal from Crist. Crist changed several ratings on Plaintiff's performance evaluation as compared to Plaintiff's mid-year review, despite acknowledging "limited amount of time that

[he] had spent with [Plaintiff] in stores." Indeed, Crist had only visited Plaintiff's stores twice in his three months as Market Manager. Plaintiff expressed disagreement with Crist's evaluation and refused to sign.

24.     On his 2011 Performance Appraisal, Plaintiff indicated that he was interested in promotion within Defendant to a managerial position, and that he would prefer to accept promotions within Maryland in the short-term but to relocate to North Carolina in the long term.

25.     On February 27, 2012, Plaintiff filed Charge No. 531-2012-00897 with the EEOC, complaining of race discrimination and retaliation. He stated that beginning in October 2011, under Crist, he had been treated less favorably than white colleagues, and had filed multiple complaints of race discrimination with Defendant.

26.     In March 2012, Brennan indicated to Crist and other Market Managers that Field Consultants were needed to travel to Charlotte, North Carolina to assist with store conversion in that market. This was an opportunity for Field Consultants to gain visibility that would be helpful for promotion, especially given Plaintiff's long-term goal of relocating to North Carolina. Unlike other Market Managers, Crist did not share this posting with his Field Consultants. Instead, Crist selected Alex Boland, a white employee, for two week-long stints in Charlotte, one in March and one in April, despite the fact that Boland was a new Field Consultant who especially needed to spend time in his stores, and despite the fact that the Brennan stated that Field Consultants should not be asked to go to Charlotte twice in order to spread the opportunity among several Field Consultants. Crist did not give a reasonable explanation for his actions when Plaintiff called these facts to his attention.

27.     In March and April 2012, Plaintiff was a top-performing Field Consultant, earning an "A" rating both months. Plaintiff posted the highest score of any Field Consultant in Market 2541 on his March Operations Balanced Scorecard.

28.     On April 24, 2012, Defendant filed a response to Plaintiff's Charge No. 531-2012-00897 with the EEOC. In that response, Defendant stated that Plaintiff was not eligible for promotion pursuant to Defendant's policies because he had not received an "A+", "A-", or "B+" score on his most recent full-year Performance Appraisal. Defendant also stated that Plaintiff was not eligible for promotion because he had allegedly indicated in his February 9, 2012 letter to Brennan complaining of race discrimination that he did not want to relocate, despite the fact

that the full context of that letter makes clear that Plaintiff meant that he did not want to be forced to relocate to another market in retaliation for complaining of race discrimination.

29.     On July 19, 2012, Plaintiff was placed on a Performance Improvement Plan (the "PIP") by Crist.  Crist's stated reasons for placing Plaintiff on the PIP were 1) that he leaned back in his chair, rolled his eyes, turned his back and sighed during a "5 minute teleconference" while Brennan was speaking; 2) that his "bearing and general body language" had exhibited a "lack of respect and professionalism" in three previous staff meetings; and 3) that he had failed to turn in a one-page "leadership essay" that he was expected to write as part of his recognition for posting the highest cumulative score in his market on the March Operations Balanced Scorecard.

30.     With respect to each of these allegations, Defendant failed to follow its own Progressive Discipline Policy (PDP).  The PDP outlines as the first step in any disciplinary process a verbal discussion "inform[ing] the employee of the . . . specific violation and of the consequences" between employee and supervisor. Crist did not verbally discuss the alleged incidents with Plaintiff prior to issuing the PIP or file the require written description of the meeting set forth in the PDP, and otherwise did not follow Defendant's PDP.

31.     Furthermore, PIPs are used for job performance-related issues, with the steps outlined in the PDP reserved for employee disciplinary procedures

32.     Plaintiff did not exhibit the "disrespectful" body language alleged in the PIP.

33.     On information and belief, Defendant had not previously disciplined Field Consultants for their "bearing and general body language" or placed employees on PIPs for such alleged conduct.

34.     Other Field Consultants were not disciplined by Defendant for turning in "leadership essays" late.

35.     The day after Crist placed Plaintiff on the PIP, Brennan announced that Crist had been promoted from Market 2541 to work as Manager, Acquisitions Integration for Defendant in Dallas, Texas.

36.     On July 19, 2012, Plaintiff sent an email to his superiors complaining that he had been placed on the PIP in retaliation for complaining of discrimination.  With respect to the PIP, he wrote, "[T]his is not about my performance. This is about 7-Eleven trying to fire me because I filed a complaint with the EEOC, and there has never been a write-up in my file."

37.     On July 20, 2012, Plaintiff filed Amended Charge No. 531-2012-00897 with the
EEOC, amending his February 2012 EEOC charge to allege that he had been placed on the PIP
in retaliation for his complaints of race discrimination.

38.     On September 10, 2012, Defendant filed a response to Amended Charge No. 531-
2012-00897 with the EEOC.

39.     In July 2012, Plaintiff told his supervisor that he was interested in a promotion to
the acquisitions team, and was told that there were no positions available for him.  He inquired
again in September 2012 and received the same response.

40.     At 7-Eleven, Plaintiff had access to the "scorecards" of other Field Consultants in
his market, which contained the same information as the non-discretionary parts of their
Performance Appraisals.

41.     Through September 2012, Plaintiff performed at an "A" level based on the
performance metrics used in Defendant's Performance Appraisal.  He finished 2012 with a "B"
rating.

42.     Sean Kennedy, a white Field Consultant, received a "C" grade on the non-
discretionary components of his 2011 Performance Appraisal, the lowest possible grade.  Where
Plaintiff received 1 "Red" metric in the top three categories dealing with the growth and
profitability of his stores, Kennedy received a "Red" metric on all three, the lowest rating
possible.  Where Plaintiff received 6 "Red" metrics overall, Kennedy received 10 "Red" metrics
overall.  Kennedy received five "Yellow" metrics and four "Green" metrics, in comparison to
Plaintiff, who received seven "Yellow" metrics and six "Green" metrics.

43.     Under Defendant's stated policy of performing only Field Consultants who had
received an "A+", "A/" or "B+" rating on their most recent full-year Performance Appraisal,
Kennedy should have been ineligible for a promotion through 2012.

44.     Kennedy continued to perform at a "C" level through at least July 2012.

45.     Kennedy had a reputation as a low-performing Field Consultant who did not
regularly visit his stores and was prone to inappropriate comments.  For example, on April 27,
2012, he sent an inappropriate email to Crist and all the Field Consultants in Market 2541
reading simply, "Boner!", in response to Crist's email thanking another Field Consultant.  To
Plaintiff's knowledge, Kennedy was never disciplined for his conduct.

46.     On December 21, 2012, it was announced that Kennedy had been promoted by Defendant to Division Logistics Manager.  Where the salary for a Field Consultant was approximately $80,000 per year, the salary for a Division Logistics Manager was approximately $125,000 per year.

47.     The Division Logistics Manager opening was not posted, or was not posted conspicuously and for a reasonable amount of time.

48.     Defendant knew of Plaintiff's interest in a promotion to a managerial position.

49.     Had the position been posted or posted in a reasonable manner, Plaintiff would have applied.

50.     In the alternative, Plaintiff's failure to apply is excused by the fact that Defendant has (misleadingly) stated on multiple occasions that it only promotes Field Consultants who have received an "A+", "A/" or "B+" rating on their most recent full-year Performance Appraisal, including in its response to Plaintiff's EEOC charge, and Plaintiff relied upon this policy in not applying for promotions, as he believed it would have been futile to apply.

51.     Defendant's promotion policy was vague and secretive, and, on information and belief, employees were typically sought out by managers for promotions.

52.     As a result of Defendant's illegal conduct, Plaintiff has a suffered severe loss and injury including, but not limited to, mental anguish, emotional distress, and economic loss.

53.     On January 23, 2013, Plaintiff filed Charge 531-2013-00734 with the EEOC, complaining of the discriminatory decision to promote Kennedy and not him to the Division Logistics Manager position.

54.     On January 27, 2014, the EEOC sent Plaintiff Right to Sue letters on both Charge 531-2013-00734 and Charge No. 531-2012-00897.

55.     Beginning in February 2014, Plaintiff was out of work on approved unpaid medical leave.

56.     Plaintiff filed and served his initial Complaint in this action on June 12, 2014, which was timely pursuant to tolling agreements entered into with Defendant concerning the above-stated charges.  He filed a First Amended Complaint in the action on August 27, 2014.

57.     On October 14, 2014, Steve Saunders, Defendant's Human Resources Leader, sent Plaintiff a letter requesting that Plaintiff provide a date when "[Plaintiff] will be able to return to work [at Defendant]." The letter did not raise any question regarding whether there was

8

a position for Plaintiff to return to at Defendant; whether staffing levels at Defendant would permit Plaintiff to return; or indicate in any way that there were any limitations on markets or zones at Defendant that would affect where Plaintiff could return to work.

58.     On October 21, 2014, Plaintiff provided a doctor's note to Defendant indicating that Plaintiff would be able to return to work on December 9, 2014.

59.     On November 3, 2014, Saunders sent a letter to Plaintiff acknowledging receipt of Plaintiff's doctor note and stating, "Based on the information provided, we will plan on your returning to work on December 9, 2014." The letter continued: "Please contact me by December 2, 2014, so we can make arrangements for your return to a full-time position as a Field Consultant on December 9, 2014. We look forward to having you back!" Again, the letter did not raise any question regarding whether there was a Field Consultant position at Defendant for Plaintiff to return to.

60.     In a November 4, 2014 phone call, Saunders told Plaintiff that Plaintiff would be returning to work in his previous market (Market 2547), and at his previous position (Field Consultant) on December 9, 2014. No question was raised during this call regarding whether there was in fact an open position for Plaintiff in Market 2547.

61.     In a December 2, 2014 phone call, Saunders again reiterated that Plaintiff would be returning to work as a Field Consultant in Market 2547 on December 9, 2014; identified who Plaintiff's supervisor would be in the zone; and committed to meeting with Plaintiff on December 9 in College Park, MD to go over changes in senior leadership, ordering systems at Defendant's stores, return of his company car, and other logistical matters regarding his return to work. No question was raised during this call regarding whether there was in fact an open position for Plaintiff in Market 2547.

62.     Less than two business days before Plaintiff's scheduled return to work, on December 5, 2014, Saunders sent a letter to Plaintiff informing him for the very first time that "we do not have an open position for you." Saunders claimed that he only checked on the "actual staffing levels" in Market 2547 a few days before Plaintiff was to return to work, and allegedly discovered that there were no available Field Consultant positions for Plaintiff in Market 2547. Saunders informed Plaintiff that he was to be classified as an employee of Defendant on an "unpaid leave of absence," and was to "check back" with Saunders in 30 days regarding whether there is an open position in the market. There are six markets within Plaintiff's zone at

Defendant (the Liberty Zone), yet Saunders did not address whether there were any open positions for Plaintiff in the Liberty Zone in his letter.

63.    Saunders also said in his letter that Plaintiff was "not expected to attend the 7-Eleven Experience," despite the fact that Plaintiff had already registered for the event, and the event was to be held well after the 30-day timeframe proposed by Saunders for checking back with him regarding the availability of a position. The "7-Eleven Experience" is a conference held annually by Defendant in Las Vegas, NV for franchisees and employees of Defendant.

64.    On information and belief, staffing of Field Consultants in Market 2547, and in the Liberty Zone as a whole, is at sufficient levels to permit Plaintiff to return to work.

### COUNT I

**Violation of Title VII —Discrimination and Retaliation**

65.    Plaintiff repeats and incorporates paragraphs 1-64 as though set forth fully herein.

66.    7-Eleven considered Plaintiff a higher performing Field Consultant than Kennedy, as evidenced by the fact that he received a higher grade on his 2011 Performance Evaluation. In addition, 7-Eleven has stated that it strongly considers a Field Consultant's performance evaluation in determining whether to promote a Field Consultant to Market Manager.

67.    As a high-performing Field Consultant, Plaintiff was better qualified for the Divisions Logistics Manager position than Kennedy, a low-performing Field Consultant.

68.    Defendant's actions in failing to post or post conspicuously the Division Logistics Manager position, failing to notify Plaintiff of its decision to relax or ignore its stated criteria for promotions, and deciding to award the position to Kennedy, were each taken due to race discrimination and/or retaliatory animus. Defendant's actions could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

69.    Defendant's stated reasons for promoting Kennedy and not Plaintiff were pretextual.

70.    Defendant's decision to promote Kennedy and not Plaintiff to the Division Logistics Manager position was motivated by race discrimination.

71.    Plaintiff had an objectively reasonable belief that Defendant engaged in unlawful employment practices, and engaged in protected activity in complaining of such employment practices.

72.     Defendant's decision to place Plaintiff on the PIP was caused by race discrimination and/or retaliatory animus.

73.     The stated reasons for placing Plaintiff on the PIP were pretextual, and Plaintiff was placed on the PIP by Crist and Brennan in retaliation for his complaints of race discrimination.

74.     The inference of retaliatory animus is particularly strong given the proximity between Plaintiff's placement on the PIP and Crist's reassignment to a job in a different market.

75.     Defendant would not have placed Plaintiff on the PIP but for Plaintiff's complaining of race discrimination.

76.     Defendant's decision to place Plaintiff on the PIP in retaliation for his complaining of race discrimination could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

77.     Defendant's decision to cancel Plaintiff's scheduled return to work from approved unpaid medical leave was caused by retaliatory animus.

78.     The stated reasons for cancelling Plaintiff's scheduled return to work from approved unpaid medical leave were pretextual, and Plaintiff's return to work was cancelled in retaliation for his filing complaints of race discrimination and retaliation.

79.     Defendant would not have cancelled Plaintiff's scheduled return to work from approved unpaid medical leave but for Plaintiff's filing complaints of race discrimination and retaliation.

80.     Defendant's decision to cancel Plaintiff's return to work from approved unpaid medical leave in retaliation for his filing complaints of race discrimination could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

## COUNT II

### Violation of Section 1981—Discrimination and Retaliation

81.     Plaintiff repeats and incorporates paragraphs 1-80 as though set forth fully herein.

82.     Defendant's actions in failing to post or post conspicuously the Division Logistics Manager position, failing to notify Plaintiff of its decision to relax or ignore its stated criteria for promotions, and deciding to award the position to Kennedy, were each taken due to race discrimination and/or retaliatory animus. Defendant's actions could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

11

83.     Defendant's decision to place Plaintiff on the PIP was caused by race discrimination and/or retaliatory animus.

84.     Defendant's decision to place Plaintiff on the PIP in retaliation for his complaining of race discrimination could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

85.     Defendant's decision to cancel Plaintiff's return to work from approved unpaid medical leave was caused by retaliatory animus.

86.     Defendant's decision to cancel Plaintiff's return to work from approved unpaid medical leave in retaliation for his complaining of race discrimination and retaliation could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

## COUNT III

### Violation of Md. Code Ann. State Gov't § 20-606—Discrimination and Retaliation

87.     Plaintiff repeats and incorporates paragraphs 1-86 as though set forth fully herein.

88.     Defendant's actions in failing to post or post conspicuously the Division Logistics Manager position, failing to notify Plaintiff of its decision to relax or ignore its stated criteria for promotions, and deciding to award the position to Kennedy, were each taken due to race discrimination and/or retaliatory animus. Defendant's actions could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

89.     Defendant's decision to place Plaintiff on the PIP was caused by race discrimination and/or retaliatory animus.

90.     Defendant's decision to place Plaintiff on the PIP in retaliation for his complaining of race discrimination could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

91.     Defendant's decision to cancel Plaintiff's return to work from approved unpaid medical leave was caused by retaliatory animus.

92.     Defendant's decision to cancel Plaintiff's return to work from approved unpaid medical leave in retaliation for his complaining of race discrimination could well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

(a)  Declare that the actions of Defendant violated Title VII, Section 1981, and Md. Code Ann. State Gov't § 20-606;

(b)  Award Plaintiff compensatory damages in an amount to be determined by a jury at trial for his mental anguish and emotional distress suffered due to Defendant's illegal conduct;

(c)  Award Plaintiff all the salary and benefits he would have received had Defendant not violated Title VII, Section 1981 and Md. Code Ann. State Gov't § 20-606, including appropriate awards of back and front pay;

(d)  Award Plaintiff economic damages due to the long-term damage to Plaintiff's earning prospects resulting from Defendant's illegal conduct;

(e)  Award Plaintiff reasonable attorney's fees and costs incurred in this action and the administrative claims that preceded it as provided by law;

(f)  Award Plaintiff interest as provided by law;

(g)  Award Plaintiff the amount of any tax on the award;

(h)  Such other and further relief this Court deems just and necessary.

Respectfully submitted,

BAILEY & EHRENBERG PLLC

Noah Peters (admitted *pro hac vice*)
Noah Peters Law
1015 18th Street, N.W.
Suite 204
Washington, D.C. 20036
Telephone: (202) 499-4222
Facsimile: 1-844-333-0706
noah@noahpeterslaw.com

-and-

13

Jason H. Ehrenberg (#16481)
1015 18th St. N.W.
Suite 204
Washington, D.C. 20036
Telephone: (202) 331-1331
Facsimile: (202) 318-7071
jhe@becounsel.com

*Attorneys for Plaintiff*